# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Donald L. Wolf, Sr., et al., | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | Case Nos: 15 C 50035-37, |
| | ) | 15 C 50103, 14 C 500337-39 |
| | ) | |
| FirstMerit Bank, N.A., | ) | |
| | ) | |
| Appellee. | ) | Judge Frederick J. Kapala |

## ORDER

The January 12, 2015 Order of the Bankruptcy Court is affirmed. The motion to withdraw is denied. The following cases are closed: 15 C 50035, 15 C 50036, 15 C 50037, and 15 C 50103. Ruling on the appeal in case numbers 14 C 50337, 14 C 50338, and 14 C 50339 is stayed pending resolution of the motion to convert by the bankruptcy court.

## STATEMENT

The debtors in the three bankruptcy cases underlying this appeal—brothers David M. Wolf and Donald L. Wolf, Jr. and their father Donald L. Wolf, Sr. (collectively the "Wolfs")—each own a fractional share of a land trust which in turn is the owner of a piece of commercial real estate at 10611-10685 Wolf Drive, Huntley, Illinois (the "Property"). FirstMerit Bank, N.A., is the holder of a defaulted note secured by the Property and any rents derived from the Property. The Wolfs, who are seeking reorganization pursuant to Chapter 11 bankruptcy petitions, moved the bankruptcy court to permit payment of certain professional fees from the rents collected from the Property since the filing of the debtors' petitions. The bankruptcy court ultimately denied the Wolfs' motion, a denial which they now appeal. For the reasons which follow, the bankruptcy court's order is affirmed and FirstMerit's related motion to withdraw the referral of an issue from the bankruptcy court is denied.

### I. BACKGROUND

The Wolfs are indirect or direct owners and officers of nine entities, eight of which have filed Chapter 11 bankruptcy petitions and have been consolidated for administrative purposes (collectively the "Chardon Debtors"). The Chardon Debtors own, among other property not relevant to the instant appeal, eight commercial real estate properties which are security for notes held by FirstMerit. FirstMerit also holds a note secured by the Property and the rents derived from the Property. The Property is not owned by the Chardon Debtors, but is instead owned by a land trust in which the Wolfs own a 100% interest (Donald Wolf, Sr. has a 51% share and the other two have 24.5% shares). FirstMerit, the Wolfs, and the Chardon Debtors signed cross-collateralization

agreements which, at least for the purposes of this appeal, had the effect of aggregating the loan amounts and securing that aggregate against all of the various property listed above. It is undisputed that the value of the various collateral is insufficient to fully cover FirstMerit's claims against the Wolfs.

The rents collected from the Property are currently being held as cash collateral for FirstMerit's loan pursuant to the agreement between the parties and § 552 of the Bankruptcy Code. The Wolfs have requested, and have been permitted, to use that cash collateral to pay certain expenses of the Property, including maintenance of the property, without objection from FirstMerit. However, the Wolfs also requested the opportunity to pay their attorneys' fees and costs, as well as expert costs, totaling $278,582.90 from the cash collateral. FirstMerit objected, arguing that the collected rents were part of its collateral and the Wolfs had not offered adequate protection to protect FirstMerit from the collateral's loss in value. After taking the issue under advisement, the bankruptcy court issued a thorough opinion, ultimately denying the Wolfs' request. In brief, the bankruptcy court rejected the Wolfs' argument that they were not required to provide adequate protection in order to use FirstMerit's cash collateral to pay their professionals and rejected their secondary argument that, even if they were required to provide adequate protection generally, the "equities of the case" exemption to that requirement applied.

The Wolfs have now each appealed, and those appeals have been consolidated for the purposes of this order. In their briefing, the Wolfs have represented that, should this court affirm the bankruptcy court's order denying them the opportunity to pay their professionals by way of FirstMerit's cash collateral, they would be unable to successfully reorganize. As a response to that representation, FirstMerit moved the bankruptcy court to convert the Wolfs' bankruptcies to Chapter 7 liquidation rather than Chapter 11 reorganization. FirstMerit also filed a motion with this court to withdraw that motion from the bankruptcy court and rule on it immediately. The court will address the motion to withdraw after resolving the cash-collateral appeal. But, before either of those things can occur, the court must address FirstMerit's argument that this court lacks jurisdiction over the cash-collateral appeal.

## II. DISCUSSION

### A. Jurisdiction

FirstMerit argues that this court lacks jurisdiction because the order from the bankruptcy court adjudicating the cash collateral issue is not "final" within the meaning of 28 U.S.C. § 158(a). Section 158(a) provides that:

> (a) The district courts of the United States shall have jurisdiction to hear appeals
>   (1) from final judgments, orders, and decrees;
>   (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
>   (3) with leave of the court, from other interlocutory orders and decrees . . . .

The Supreme Court has recently explained the difference between § 158(a)(1) jurisdiction and the normal final-decision jurisdiction in most civil proceedings:

2

> In ordinary civil litigation, a case in federal district court culminates in a final decision, a ruling by which a district court disassociates itself from a case. A party can typically appeal as of right only from that final decision. This rule reflects the conclusion that permitting piecemeal, prejudgment appeals undermines efficient judicial administration and encroaches upon the prerogatives of district court judges, who play a special role in managing ongoing litigation.
>
> The rules are different in bankruptcy. A bankruptcy case involves an aggregation of individual controversies, many of which would exist as stand-alone lawsuits but for the bankrupt status of the debtor. Accordingly, Congress has long provided that orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case. The current bankruptcy appeals statute reflects this approach: It authorizes appeals as of right not only from final judgments in cases but from "final judgments, orders, and decrees . . . in cases and proceedings." § 158(a).

Bullard v. Blue Hills Bank, 575 U.S. ___, 135 S. Ct. 1686, 1691-92 (2015) (alterations, citations, quotation marks omitted). At the time the briefing in this case was completed, Bullard had not been released, and thus the parties did not have the benefit of the Supreme Court's most recent analysis of finality for the purposes of bankruptcy, although that case arose in the Chapter 13 denial-of-a-potential-plan context, not the Chapter 11 payment-of-professional-fees-with-cash-collateral one. Nevertheless, the court need not consider what impact the analysis in Bullard has on the parties' arguments or ultimately determine whether the bankruptcy court's order is final, as this court would grant leave to hear the appeal pursuant to § 158(a)(3) in any event.

Section 158(a)(3) permits this court to accept appeals from interlocutory orders with leave of court. The parties concede that the bankruptcy rules, specifically Rule 8004(d), permits this court to treat the Wolfs' notice of appeal as a request for interlocutory appeal, which the parties have addressed in their briefs on the presumption that the court may do so. Bullard describes the authority to grant interlocutory appeals in situations like this as a "useful safety valve[] for promptly correcting serious errors and addressing important legal questions." Id. at 1696 (quotation marks omitted).

> In determining whether to allow an interlocutory appeal from the Bankruptcy Court under § 158(a), courts apply the general interlocutory appeal standard from 28 U.S.C. § 1292(b). The appellant must satisfy four criteria in order to merit leave to appeal under section 1292(b): (1) there must be a question of law, (2) it must be controlling, (3) it must be contestable, and (4) its resolution must promise to speed up the litigation. The party seeking leave to appeal bears the burden of demonstrating that all four factors are satisfied.

In re MCK Millennium Ctr. Parking, LLC, Nos. 12 B 24676, 15 C 1163, 2015 WL 2004887, at *2 (N.D. Ill. Apr. 29, 2015) (citations omitted). In any event, because interlocutory appeals violate the normal judicial goals of finality and efficiency that come with the final judgment rule, leave to appeal should not be granted "absent exceptional circumstances." Id. (quotation marks omitted).

This case meets all four criteria. The issue presented, as detailed more below, is a pure

3

question of law and would be controlling, which is defined as "quite likely to affect the outcome or the further course of litigation." Id. at *3 (quotation marks omitted). The parties have both indicated or argued that the success of the Chapter 11 reorganization will be premised on the continued services of the Wolfs' various professionals, whose services are in turn premised on the ability to be paid immediately. Moreover, the issue in this case is contestable, which is primarily concerned with whether there are "substantial conflicting decisions regarding the claimed controlling issue of law." Id. at *4 (quotation marks omitted). As set out in greater detail below, the issue raised in this case has split the courts, resulting in essentially two directly opposing opinions in the bankruptcy courts of this district. Finally, the resolution of this issue promises to speed up the litigation, as an affirmance would potentially result in the end of the Chapter 11 proceeding, which would also potentially moot the other outstanding appeal in these cases. A reversal would permit the Wolfs to pay their professionals, who would presumably then return to work on the case and move the case forward. Thus, because all four criteria are met, this court would exercise its discretion to hear the appeal regardless of the finality of the underlying order.

## B. Valuation of the Future Rents

The major thrust of the Wolfs' appeal revolves around the valuation of FirstMerit's cash collateral for the purposes of adequate protection. Section 552 sets out rules for how a bankruptcy petition affects a security interest. 11 U.S.C. § 552. Normally, "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." § 552(a). However, there is an exception to that normal rule

> if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property . . . then such security interest extends to such rents . . . acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

§ 552(b)(2). The parties agree that FirstMerit and the Wolfs entered into a security agreement which extended to the rents derived from the Property, and thus FirstMerit has a valid security interest against all rents collected after the filing of the Wolfs' petitions.

However, § 552(b)(2) is subject, by its own terms, to the provisions of § 363. Section 363 permits the trustee, or in this case the debtor-in-possession,[1] to use or transfer certain property of the estate, even where a valid security interest exists. See § 363(b)(1) ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."). Section 363 has special rules for cash collateral, which it defines as "cash . . . or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes . . . rents . . . subject to a security interest as provided in section 552(b) of this title,

---

[1]Section 1107 provides that a debtor-in-possession may exercise most of the powers of a trustee of a bankruptcy estate, including all of the powers relevant to this appeal. See 11 U.S.C. § 1107(a).

4

whether existing before or after the commencement of a case under this title." § 363(a). The parties agree that the collected rents here are cash collateral pursuant to § 363(a).

Section 363 forbids a debtor-in-possession's use of cash collateral unless each entity with an interest in the property consents to its use, § 363(c)(2)(A), or over the objection of an entity with an interest so long as adequate protection is provided by the debtor-in-possession, § 363(c)(2)(B), (e). Adequate protection is defined in § 361, which provides that a debtor-in-possession may (1) make a "cash payment or periodic cash payments" to cover the "decrease in value of such entity's interest in the property," (2) provide "an additional or replacement lien to the extent" the use of the cash collateral "results in a decrease in the value of such entity's interest in such property," or (3) grant some other kind of relief which would "result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." § 361. The Wolfs have not proposed providing a cash payment or periodic cash payments, a replacement lien, or any other relief to offset the reduction in value of the cash collateral except to suggest they could use other moneys from the same cash collateral to provide a payment or replacement lien. Instead, the Wolfs principally argue that the proposed reduction of the cash collateral by $278,582.90 is not a reduction in value of FirstMerit's security interest in the cash collateral.

In making this argument, the Wolfs urge this court to adopt the "dual valuation" method, whereby a security interest is valued in different ways for adequate protection purposes under §§ 361 and 363 and for determining a creditor's secured claim under § 506. See 11 U.S.C. § 506(a)(1) (noting that, to determine the value of a secured creditor's secured interest for the purposes of his claim against the estate, "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest"). The "dual valuation" method links the valuation of collateral for the purposes of adequate protection under §§ 361 and 363 to the petition date. Thus, since there were apparently no rents collected in any account as of the date of the Wolfs' petitions, the value of FirstMerit's security interest in the rent-based cash collateral is zero (or, in any event, considerably less than the current account's balance less the $278,582.90 the Wolfs seek to use). Therefore, since the account can be reduced by $278,582.90 without reducing the account's balance below the value of FirstMerit's interest, the Wolfs need not provide adequate protection.

The Wolfs rely principally on In re Addison Properties Ltd., 185 B.R. 766 (Bankr. N.D. Ill. 1995), for the proposition that the "dual valuation" method applies, and the bankruptcy court in the instant case spent the bulk of its opinion discussing its disagreement with the holding in Addison. In Addison, the bankruptcy court noted that § 506(a) bifurcates an undersecured creditor's claim. Thus, when, as here, a creditor's allowed claim is greater than the value of the security, the allowed claim is split into a secured claim up to the value of the collateral and the remainder of the claim becomes unsecured. The court reviewed three possible adequate protection valuation methods: the "single valuation," wherein adequate protection and confirmation values are the same and both evaluated at the date of filing; "continuous valuation," wherein value of a claim is updated throughout the litigation as rents accrue; and "dual valuation," wherein value is set for the purposes of adequate protection at the date of petition and set for confirmation purposes on the date of the confirmation hearing. Id. at 771-84. The Addison court opined, in circumstances very similar to this case, that the "dual valuation" method was the most appropriate for post-petition rents and thus

5

a debtor-in-possession could make use of the rents to pay professionals so long as the collateral securing the original bifurcated allowed secured claim under § 506(a) was not decreasing in value. Id. at 784.

Addison has met with lukewarm reception in the twenty years since it was written, see 2 Collier Bankruptcy Manual § 506.02[9] & nn. 126-27 (4th ed.) (noting various approaches), with the most recent court to address the valuation of post-petition rents which a debtor-in-possession proposes to use to pay its professional fees noting that it does not reflect the majority rule on the issue.[2] See Putnal v. SunTrust Bank, 489 B.R. 285, 291 (M.D. Ga. 2013). Regardless, the bankruptcy court in this case noted many of the criticisms of Addison's approach, and this court has little to add to the bankruptcy court's thoughtful opinion.

However, this court finds it particularly noteworthy that the Addison opinion conflated the concepts of a security interest with an allowed secured claim. Section 363 protects a creditor's "interest" in cash collateral, and § 552 extends the "security interest . . . to such rents . . . acquired by the estate after the commencement of the case . . . ." Neither seeks to protect the value of the allowed secured claim, which under § 506 is not fully valuated until confirmation, but instead extends the creditor's security interest during the pendency of the bankruptcy case. The Seventh Circuit has limited a secured creditor's ability to "fence off" a collateral and its cash proceeds where the creditor's collateral is greater in value than its interest, see In re James Wilson Assocs., 965 F.2d 160, 171 (7th Cir. 1992), but adopting the approach sought by the Wolfs would frustrate the protection of that interest and undermine Congress's intent in passing § 363 and, more specifically, § 552.[3]

In short, the Wolfs' proposed approach is nothing more than an attempt to give a junior unsecured creditor priority over a senior undersecured creditor's interest in the same collateral, notwithstanding Congress's explicit instructions otherwise. Contrary to the Wolfs' predictions of Chapter 11 cases failing regularly if their approach is not adopted, bankruptcy law already has a procedure built in for the payment of professional fees. Sections 327, 330, and 503(b) work in concert to permit the bankruptcy court to allow for compensation of professionals, including attorneys, which are hired by the debtor-in-possession and work for the benefit of the debtor's estate. Section 507 provides that the allowed claim is an administrative expense, which is a first priority unsecured claim against the estate. As the Addison court notes, however, that designation does not

---

[2]The parties argue over whether Addison represents the majority rule by counting and discounting various district and bankruptcy court opinions which they indicate stand for an explicit or implicit acceptance or rejection of the "dual valuation" method for post-petition rents. The court does not find delving into head counting to be particularly helpful, it is clear that the question has divided the courts that have discussed the issue and that the division is not a stark one either in favor or against. The court does note, however, that the leading bankruptcy treatise from Collier suggests that the trend of authority is against the Wolfs' position. See Collier, supra, § 330.05[1].

[3]Even if Addison's treatment of "security interest" and "allowed secured claim" as the same concept is accurate, courts that have recognized the "addition" principle at the confirmation stage permits that an allowed secured claim is increased throughout a bankruptcy to match the incoming rents and other proceeds exempted by the normal rule in § 552(b). See generally In re Lichtin/Wade, L.L.C., 486 B.R. 665, 674-80 (Bankr. E.D.N.C. 2013) (explaining the "addition" concept). Thus, even treating those phrases as synonymous results in, essentially, the continuous valuation method for, at least, the limited classifications of collateral in § 552(b).

guarantee payment, see 185 B.R. at 768, but that is a reality Congress built into the bankruptcy code which this court lacks the authority to alter. The Wolfs' proposed approach would take the junior interest of the unsecured creditor (the Wolfs' professionals) and provide that interest with priority over the senior interest of FirstMerit's secured interest in the same collateral notwithstanding the clear language of § 552. See In re James Wilson Assocs., 965 F.2d at 171 (reasoning that it is "permissible to bite into [the value of a secured creditor's collateral] in order to pay attorney's fees and to protect the interest of another, but junior, secured creditor," but only "given the oversecured character of [the principal secured creditor's] claim").

The Wolfs' arguments to the contrary are not persuasive. First, the Wolfs argue that the rejection of the Addison "dual valuation" method creates a split between the Eastern Division and Western Division of this court and thus the remedies available will depend on the county in which the bankruptcy case is filed. But orders from the trial courts are not binding on one another and disagreements between such judges arise frequently and, as noted by FirstMerit, the judges in the Eastern Division itself have not come to a consensus on the point. Second, the Wolfs argue that § 506(a) has a specific valuation time frame for secured claims in the context of plan confirmation, and that since no section provides a similar time frame for post-petition rents, that the court should use the default rule of the petition date. However, the Wolfs provide no authority for the petition date being the default rule in this context, and, even if that were the default rule, § 552 strongly suggests that the interest should be updated as the rents come in throughout the pendency of the bankruptcy case, otherwise extending the security interest, at least in the context of an undersecured creditor, becomes virtually toothless.

Third, the Wolfs argue that the bankruptcy court's approach is inconsistent with the Supreme Court's opinion in United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365 (1988). In Timbers, a unanimous Supreme Court determined that an undersecured creditor cannot demand adequate protection payments based on the lost opportunity costs of foreclosure and delayed possession of the collateral. Id. at 382. The Wolfs point out that, in Timbers, the Court noted that one difference between § 361 (dealing with adequate protection) and § 1129 (dealing with plan confirmation) is that "[i]n § 361(3) . . . the relief pending the stay need only be such as will result in the realization of the indubitable equivalent of the collateral." Id. at 377 (alteration, emphasis, and quotation marks omitted). The Court goes on:

> It is obvious (since §§ 361 and 362(d)(1) do not entitle the secured creditor to immediate payment of the principal of his collateral) that this "realization" is to "result" not at once, but only upon completion of the reorganization. It is then that he must be assured "realization . . . of the indubitable equivalent" of his collateral. To put the point differently: similarity of outcome between § 361(3) and § 1129 would be demanded only if the former read "such other relief . . . as will give such entity, as of the date of the relief, the indubitable equivalent of such entity's interest in such property."

Id. at 377-78 (alterations in original) (emphasis omitted). Even if the Wolfs' argument that this passage suggests that valuation of collateral for the purposes of § 361 should not normally occur on

7

an ongoing basis or at the time of the request to use the collateral,[4] it does not address the special treatment provided to the on-going security interest in rents provided by § 552. Indeed, earlier in the opinion where the Court actually addressed § 552, it suggests that adequate protection would be necessary to use rents over which a security interest extends, by contrasting the way the petitioner in that case seeks adequate protection payments for the delay in taking possession of its collateral with the treatment in rents in § 552. See id. at 374. Allowing adequate protection for petitioner's delay-based claims would be "structurally inconsistent," according to the Court, with the special treatment of rents under § 552(b). Id. Thus, Timbers not only fails to support the Wolfs' position, it actually undermines it.

Fourth, the Wolfs argue that the bankruptcy court's decision eliminates a debtor-in-possession's ability to provide "periodic cash payments" or a "replacement lien" as adequate protection pursuant to § 361. The court disagrees. The bankruptcy court's decision eliminates the ability to provide cash payments or a lien from property over which the secured creditor already has a security interest as adequate protection. The debtors here, who are individuals, could provide a plan for periodic cash payments from their future earnings or a replacement lien on unencumbered property or even an "indubitable equivalent" lien on exempted property.[5] The debtors did not propose any of these things, instead they proposed to provide payments or a lien from money over which FirstMerit already has a security interest. That is not adequate protection, it is illusory protection.

Finally, the Wolfs argue that the bankruptcy court ignored several policy implications in its rejection of the Addison approach. Initially, they argue that giving effect to § 552(b)'s special treatment of post-petition rents at the adequate protection stage gives creditors what amounts to a veto power over some debtors' Chapter 11 cases. Again, though, this argument ignores the fact that the bankruptcy code has a specific system already in place for the payment of professional fees and the Wolfs' proposed approach is simply an attempt to sidestep that system in order to secure their professionals more favorable payment terms than their secured creditor. Moreover, the creditors are not given a "veto," they are simply entitled to adequate protection which can be provided through any number of means, including in this case by post-petition personal earnings or by selling, or taking a loan secured by, valuable exempt property. Finally, to the extent that this "veto" public policy concern is valid, it is an argument for Congress to modify the specialized treatment of rents set out in § 552, it is not a reason for this court to ignore that treatment.

The Wolfs second policy argument is that the bankruptcy court's approach will substantially increase the administrative costs of Chapter 11, since a new valuation of an asset will need to be done consistently throughout the litigation. This concern is likely overblown, the asset will only

---

[4]The court is not convinced that the Wolfs' reading is accurate. That language—which the court concedes is not entirely transparent—appears to this court to discuss, rather than the time of valuation, the purpose of providing an "indubitable equivalent" as adequate protection (maintaining the interest until confirmation) and providing the same at the time of plan confirmation (paying the full present value of the claim). Nevertheless, the court will accept the Wolfs' reading, as even if it is accurate it does not change the result in this case.

[5]According to FirstMerit's brief and an exhibit attached thereto, which the Wolfs do not dispute, at least one of the Wolfs have an exempted home in Florida valued at over a million dollars which is owned without encumbrance.

need to be valued when a debtor-in-possession or trustee seeks to use cash collateral, otherwise it can be valuated at the time of the confirmation hearing just like any other secured asset. Moreover, cash collateral is not all that hard to valuate. Unlike real estate or chattel, which must be appraised by comparison to various appropriate market factors, rents and the other proceedings mentioned in § 552 are typically in the form of cash payments. In the vast majority of cases—including this case—its value is how much cash has been collected and placed in escrow. Glancing at an account balance is not an onerous administrative responsibility. The Addison opinion points out that the general prohibition against post-petition interest for unsecured claims is based on administrative ease to avoid continuous recomputation, see 185 B.R. at 783 (quoting Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 164 (1946)), but § 552, by giving rents specialized treatment, suggests that Congress wanted to do the exact opposite for post-petition rents which were covered by a pre-petition security agreement. Finally, as before, this policy concern might be a reason to suggest that Congress should modify the treatment of post-petition rents under § 552, but it is not a reason for ignoring that § 552(b) explicitly states that the security interest should extend over rents and proceeds during the pendency of the bankruptcy proceeding.

In short, then, the court concurs with the bankruptcy court that cash collateral, secured by way of § 552, may not be used by a debtor-in-possession pursuant to § 363 without consent or providing adequate protection for its value and rejects the approach adopted in Addison which essentially seeks to reduce that value to zero until the confirmation hearing as inconsistent with the plain language of § 552.

### C. Equities-of-the-Case Exception

As the court has explained supra, post-petition rents secured by a pre-petition security agreement cannot be used by a debtor-in-possession without offering adequate protection pursuant to §§ 363 & 552.[6] However, § 552(b)(2) has a built-in exception, permitting the bankruptcy court to refuse to extend the post-petition security interest over the rents or other proceeds protected by § 552(b)(2) "based on the equities of the case." As an alternative argument, the Wolfs contend that the bankruptcy court erred where it refused to apply the equities-of-the-case exception to the post-petition rents in this case in order to prevent FirstMerit from having a security interest in at least enough of that money to allow them to pay their professionals. Without a security interest pursuant to § 552(b), the money would not qualify as cash collateral under § 363(a) and thus no adequate protection would be necessary.

The Seventh Circuit has only addressed the equities-of-the-case exception to § 552(b) once,

---

[6]The court notes, and the Wolfs mention in passing, that § 552 and § 363 have a potential drafting problem that causes some interpretative problems. In particular, § 552(b)(2) extends a security interest to post-petition rents "[e]xcept as provided in section[] 363," suggesting that if a debtor-in-possession complies with § 363, no security interest extends at all pursuant to § 552(b)(2). The problem with that, though, is that § 363(a) defines cash collateral to include "rents . . . subject to a security interest as provided in section 552(b)." So that, in order to qualify for the extension of a security interest pursuant to § 552(b), the interest must potentially meet the requirements of § 363, but to meet those requirements the interest must meet the requirements of § 552, which in turn requires meeting the requirements of § 363, etc. This creates the potential for a sort of infinitely regressive feedback loop, which would be absurd. This court's interpretation is the only one this court sees, or that either party or any other court has suggested, which would avoid this potential problem and give full effect to the provisions of both sections.

9

and there held, quite clearly, that "[t]he equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral." J. Catton Farms, Inc. v. First Nat'l Bank of Chi., 779 F.2d 1242, 1246 (7th Cir. 1985). The Wolfs do not suggest that they fit within that language. Thus, the bankruptcy court found that the equities-of-the-case exception did not apply to permit the Wolfs to limit FirstMerit's security interest over the post-petition rents in order to pay the Wolfs' professional fees.

In their appeal, however, the Wolfs note that some courts have permitted the equities-of-the-case exception to have a broader reach and grant the bankruptcy court considerable discretionary authority, or at least suggested that they would permit such a broader reach. See, e.g., United Va. Bank v. Slab Fork Coal Co., 784 F.2d 1188, 1191 (4th Cir. 1986) ("Notwithstanding our decision today, it should be noted that § 552(b) gives the bankruptcy court considerable latitude in applying pre-petition security interests to post-petition proceeds. As evidenced by the final clause in § 552(b), a bankruptcy court may choose not to apply a pre-petition security interest to post-petition proceeds 'based on the equities of the case.' It appears clear from the legislative history related to § 552 that Congress undertook in that section to find an appropriate balance between the rights of secured creditors and the rehabilitative purposes of the Bankruptcy Code. The latitude afforded to the bankruptcy court seems to this court to indicate that such a balancing of interests was intended in the framing of § 552."). The bankruptcy court recognized that potentially broader reach, notwithstanding the lack of acceptance of it by the Seventh Circuit, but ultimately found that, even if it applies, it would not apply to the Wolfs' case because they failed to show that the professional fees would benefit FirstMerit or that there is not a more appropriate source from which to pay the fees.

Even presuming that it would be appropriate in some cases to exercise the equities-of-the-case exception in order to fund the rehabilitation of a debtor by way of a secured creditor's collateral, the bankruptcy court did not err in determining that this is not such a case. This case comes down to whether it is more equitable to require a secured creditor to pay for debtors' professional fees or to require the debtors to pay those fees from exempted property with significant value or by way of their plan through normal bankruptcy processes. Since the default rule is that a debtor is responsible for the payment of his professionals and secured creditors are not, see §§ 506-07; In re Blackwood Assocs., 153 F.3d 61, 68 (2d Cir. 1998), the bankruptcy court did not err in requiring that the professionals be paid by some other available means, whether that be from the significant exempt assets of the debtors or through the normal administrative expense procedure in the plan itself.

### D. FirstMerit's Motion to Withdraw Referral

That leaves only FirstMerit's motion to withdraw the referral to the bankruptcy court of its motion to convert the Wolfs' cases to liquidation. That motion is denied. The motion to convert the Wolfs' bankruptcy cases to liquidation is a "core" bankruptcy proceeding, see 28 U.S.C. § 157; In re U.S. Brass Corp., 110 F.3d 1261, 1268 (7th Cir. 1997) ("Core proceedings are actions by or against the debtor that arise under the Bankruptcy Code in the strong sense that the Code itself is the source of the claimant's right or remedy, rather than just the procedural vehicle for the assertion of a right conferred by some other body of law, normally state law."), which is one of the most

important factors to determining whether withdrawal is appropriate, see LHC, LLC v. Club Sporting Consulting Grp., Inc., Nos. 14 C 9703, 14 C 10105, 2015 WL 4158703, at *1 (N.D. Ill. July 8, 2015). Moreover, the court disagrees with FirstMerit that this court is in an equal position to determine the motion to convert as the bankruptcy court. Although, as FirstMerit correctly notes, this court is very well versed in the disputes between FirstMerit and the Wolfs which make up the basis for both this appeal and the pending appeal on the question of relief from the automatic stay, the bankruptcy court is much better versed in the bankruptcy case as a whole. Additionally, FirstMerit's concerns about delay are not well-taken, FirstMerit's litigation strategy is the clear cause of many of the delays and the court will not permit it to profit from its own delay-based strategy. The entire point of the referral system is to provide a specialist judge to rule on bankruptcy issues, which is then appealable—following a final judgment or certification—to an Article III judge, and there is no basis for upsetting that normal framework in this case.

## III. CONCLUSION

Because the Wolfs did not offer to provide adequate protection and because the equities-of-the-case exception does not apply to this case, the bankruptcy court's order denying the Wolfs' request to use FirstMerit's cash collateral to pay their professional fees is affirmed. FirstMerit's request to withdraw its motion to convert is denied. Ruling on the other appeal currently pending, which deals with FirstMerit's appeal of the bankruptcy court's denial of its motion for relief from the automatic stay, is stayed pending resolution of FirstMerit's motion to convert, which the parties have represented may make that appeal moot.

Date: 7/31/2015

ENTER:

_____
FREDERICK J. KAPALA

District Judge

11